DREW, J.
Cody Black was employed as a general laborer by H & S Services, Inc. d/b/a Snelling Temporaries Services, which assigned him to work at Lofland Company. On November 17, 1999, after having worked at Lofland for approximately one week, Black injured his hands while pushing rods measuring approximately 15 feet in length into a rebar machine. As Black used his left hand to guide a rod, his left hand was pulled into the rebar machine, and three of his fingers (index, middle, and small) on that hand were severed. Black was unable to recall what happened next, but he alleged in his claim that when he attempted to use his right hand to pull his left hand from the rebar machine, his right hand was crushed.
Revascularization and nerve repairs were performed on Black’s left ring finger by Dr. Forrest Wall. K-wires were placed in the right fingers, and the soft tissue was repaired on these fingers. The next month a skin graft was done on the left hand. Dr. Wall subsequently amputated Black’s right small finger at the distal interphalangeal joint.
Dr. Philip Osborne evaluated Black in June of 2000 and assigned the following impairment ratings for Black’s fingers and hands:
[[Image here]]
[¡According to Dr. Osborne, total impairment of Black’s left hand was 59%, which converts to 53% impairment of the left upper extremity, which further converts to 32% whole person impairment. Total impairment of Black’s right hand was 44%, which converts to 40% impairment of the right upper extremity, which further converts to 24% whole person impairment. Dr. Osborne concluded that overall Black had 48% whole person impairment. In his report to Dr. Wall, Dr. Osborne wrote that Black could easily do sedentary and light work, with restrictions against repetitive gripping or grasping, climbing ladders, or working at unprotected heights.
Black, who was left-hand dominant prior to the accident, was deposed on June 18, 2001. Regarding his left hand, Black testified that he was unable to put his palm face down on a table because the left ring finger, which he was unable to straighten, was bent in toward the palm. His left thumb was unaffected by the accident which severed the index, middle, and small fingers on his left hand.
Black testified that he was able to place his right palm face down on a table and flatten his hand, except for his ring finger, which was bent upwards at the knuckle. The ring finger remained permanently in that position. Black was unable to make a fist with his right hand, but he was able to *267 meet his right index finger and right thumb at the ends. He was unable to otherwise bend the fingers on his right hand, but he could move them down to a 90-degree angle from the palm without bending them. The tip of his right small finger was removed by Dr. Wall during surgery.
| ¡¡Black lived with his parents from the time of the accident until February of 2001. Black testified that he could:
• Write, although sometimes his handwriting was not legible;
• “Hunt and peck” on a computer keyboard;
• Shave several times a week with an electric shaver;
• Fix his own sandwiches;
• Drive a car, even though he could not grip the steering wheel, as he used his palm and sometimes the area between his thumb and fingers to steer;
• Sweep and mop his apartment;
• Wash and iron his clothes;
• Use his right thumb to operate a TV remote control;
• Operate a touch-tone phone with his thumb;
• Turn on lights;
• Strip and make a bed in 10-15 minutes;
• Wipe a commode, shower, tub, and sink; and
• Operate a vacuum cleaner for a short period of time until the handle irritated his right hand, although he was only able to clean the area immediately around him because he could not stretch.
On August 27, 2001, Black was tragically murdered. His mother, Sylvia Black, was substituted as party plaintiff. Trial was held in this matter on October 8, 2002, and the WCJ rendered judgment on December 4, 2002. Black was awarded 70 weeks of permanent partial disability (“PPD”) benefits: 20 weeks for the loss of the left small finger, 20 weeks for the loss of the left middle finger, and 30 weeks for the loss of the left index finger. 1¿These payments were subject to a credit for the 97 weeks of indemnity payments already received by Black. The WCJ denied Black’s demands for:
• a lump sum award of $30,000 under La. R.S. 23:1221(4)(s);
• penalties and attorney fees relating to vocational rehabilitation services because the WCJ concluded that the defendants provided adequate vocational rehabilitation services; and
• penalties and attorney fees because the WCJ concluded that the defendants were not arbitrary and capricious in not paying PPD benefits.
The WCJ also granted defendants’ motion for involuntary dismissal in part.
Mrs. Black appealed the judgment. Defendants answered the appeal seeking attorney fees and costs for what they assert is a frivolous appeal.

Permanent Partial Disability Payments

Mrs. Black first argues on appeal that the WCJ erred in not awarding PPD benefits for the damage to her son’s left ring finger and right fingers. The WCJ awarded PPD benefits only for the loss of the three fingers on Black’s left hand.
La. R.S. 23:1221(4) sets forth the compensation for the anatomical loss of use or amputation of fingers:
4) Permanent partial disability. In the following cases, compensation shall be solely for anatomical loss of use or amputation and shall be as follows:
(a) For the loss of a thumb, sixty-six and two-thirds percent of wages during fifty weeks.
*268 (b) For the loss of a first finger, commonly called the index finger, sixty-six and two-thirds percent of wages during thirty weeks.
(c) For the loss of any other finger, or a big toe, sixty-six and two-thirds percent of wages during twenty weeks.
[[Image here]]
|RThe parties dispute whether Dr. Osborne’s disability ratings comply with La. R.S. 23:1221(4)(q), which provides:
No benefits shall be awarded or payable in this Paragraph unless the percentage of the anatomical loss of use or amputation, as provided in Subparagraphs (a) through (o) of this Paragraph or the percentage of the loss of physical function as provided in Subparagraph (p) or (s) of this Paragraph is as established in the most recent edition of the American Medical Association’s “Guides to the Evaluation of Permanent Impairment.”
However, it is unnecessary for this court to determine whether Dr. Osborne’s ratings comply with the above requirement. Even assuming that the evidence established that Black had been entitled to additional PPD benefits beyond those awarded by the WCJ, such benefits would have ended on the date of his death.
An employee’s right to workers’ compensation benefits terminates upon his death. Ryder v. Industrial Const. Co., 616 So.2d 857 (La.App. 3rd Cir.1993), unit denied, 619 So.2d 1068 (La.1993). Even though the statutory scheme allows for a specific number of weeks of benefits depending on the part of the body that it lost, the result is still the same when the claimant dies while receiving benefits. This issue has been addressed by the Third Circuit:
The right of an employee to enforce the obligation of an employer to pay disability benefits is a heritable property right which is transmitted to his heirs upon his death. This rule, however, is limited to the benefits which had accrued to the employee prior to his death. Weekly benefits which would have been paid, but for the death of the employee, are not considered accrued benefits. Guillot v. Weaver Brothers & Thompson Lumber Company, 31 So.2d 278 (La.App. 2d Cir.1947); Turner v. Southern Wheel and Rim Service, Inc., 332 So.2d 770 (La.1976).
|fiThe plaintiff contends that a different rule should apply in the case of a scheduled loss. She argues that on the date of the. amputation her son had a vested right in 150 weeks of benefits under LSA-R.S.- 23:1221(4)(e), and that upon his death, she inherited his right to those benefits. We disagree.
The general purpose of the disability section of the worker’s compensation statute is to compensate an employee during the “period of such disability.” LSA-R.S. 23:1221, paragraphs 1, 2 and 3. That is why an employer can have no obligation to pay benefits other than on a weekly basis. Once an employee dies, the disability terminates and along with it goes the employer’s obligation to pay. This is the basic rationale behind the Guillot decision and its progeny.
The scheduled benefits portion of the statute is in the same section as the one dealing with general disability benefits and is intended as a parallel remedy. Jacks v. Banister Pipelines America, 418 So.2d 524 (La.1982). Both provide for benefits only on a weekly basis. LSA-R.S. 23:1221. Had the legislature felt a different rule was needed for scheduled benefits, it would have provided for a lump sum award instead of payments on a weekly basis.
*269 Chapman v. Home Indem. Co., 442 So.2d 1388, 1389 (La.App. 3d Cir.1983), writ denied, 445 So.2d 437 (La.1984).
Appellant also maintains that in addition to the indemnity benefits Black received, he should have also received the additional PPD checks before he died, and the defendants were arbitrary and capricious in failing to pay the additional benefits. Mrs. Black avers that Black should have begun receiving PPD benefits for each injured finger within 30 days after defendants received Dr. Osborne’s disability rating.[1] Accordingly, she submits that for the injuries to Black’s fingers on his left hand, her son should have received four checks for 20 weeks, then one check for 10 |7weeks. For the fingers on the right hand, it is insisted that he should have received three checks for 20 weeks, and then one check for 10 weeks.
In essence, Mrs. Black is arguing that the checks should have been distributed by defendants on a concurrent schedule. However, the schedule of payments sought by appellant is not permitted. Subject to limitations set forth in La. R.S. 23:1221(4)(Z), in a situation where multiple specific injuries are suffered, the compen-sable periods for the individual losses are cumulative. Hutchinson v. Livingston Wood Products, 562 So.2d 883 (La.1990). Although cumulative, the compensable periods are consecutive and not concurrent. See, Davis v. Hawthorne, 16 La.App. 172, 133 So. 532 (La.App. 2d Cir.1931).
Allowing Black to collect benefits for the loss of his fingers through concurrent payments would lead to absurd results. For instance, it would place Black in a superior position to that of a claimant who loses a hand and is entitled to “sixty-six and two-thirds percent of wages” during 150 weeks pursuant to La. R.S. 23:1221(4)(e), but who dies before the period of 150 weeks ends. In such circumstances, the claimant who lost a hand would not have collected all the benefits that were potentially available, while Black would have been able to receive all his benefits in a span of 30 weeks.
It is clear that Black had received all benefits to which he was entitled when he died. La. R.S. 23:1223 provides in part that when a claimant has received temporary total disability benefits, permanent total disability benefits, or supplemental earnings benefits, the number of weeks of compensation already paid is to be deducted from the number of weeks of |SPPD benefits. Black was entitled to PPD benefits of $102 per week. He died approximately 92 weeks after he was injured. He received 97 weeks of benefits at $102 per week, for a total of $9,894, during his period of injury. Therefore, he actually received more than that to which he was entitled. Plaintiffs arguments on the issue of PPD benefits are without merit. There was no error in the WCJ’s denial of Black’s claim for additional PPD benefits, or in the WCJ’s denial of Black’s claim that defendants were arbitrary and capricious in withholding PPD benefits.

Lump Sum Payment

Mrs. Black next contends that the WCJ erred in not awarding the lump sum benefit of $30,000 for the “loss” of her son’s hands. La. R.S. 23:1221(4)(s) provides, in part:
(i) In addition to any other benefits to which an injured employee may be entitled under this Chapter, any employee suffering an injury as a result of an accident arising out of and in the course and scope of his employment shall be *270 entitled to a sum of thirty thousand dollars, payable within one year after the date of the injury....
[[Image here]]
(iii) Only the following injuries shall be considered injuries for which benefits pursuant to this Subparagraph may be claimed:
(aa) Paraplegia or quadriplegia or the total anatomical loss of both hands, or both arms, or both feet, or both legs, or both eyes, or one hand and one foot, or any of two thereof; however, functional loss or loss of use shall not constitute anatomical loss.
[[Image here]]
Such an award is exempt from the provisions of La. R.S. 23:1223.
| flAppellant contends that La. R.S. 23:1221(4)(s) does not define the phrase “total anatomical loss.” She asserts that it is open to interpretation, and for support, she points to Subparagraph (4)(n), which provides that a “permanent total anatomical loss of the use of a member is equivalent to the amputation of the member.” Appellant maintains, therefore, that the damage to Black’s fingers was the functional equivalent of an anatomical loss or amputation of his hands.
This argument ignores the clear language of subparagraph (4)(s)(iii)(aa), which states, “functional loss or loss of use shall not constitute anatomical loss.” What Black suffered was a functional loss of use of his hands to some degree, but it was not an anatomical loss of his hands as contemplated by the statute. Moreover, Black did not even suffer total loss of the use of his hands. Dr. Osborne concluded that total impairment of Black’s left hand was 59%, and total impairment of the right hand was 44%. Accordingly, Black was not eligible to receive the lump sum payment under La. R.S. 23:1221(4)(s), and the WCJ properly rejected appellant’s claim,

Vocational Rehabilitation Services

It is further contended by appellant that the WCJ erred in denying her claim for attorney fees and penalties due to the defendants’ alleged failure to provide adequate vocational rehabilitation services.
The provisions governing the rehabilitation of an injured employee are set forth in La. R.S. 23:1226, which states, in part:
A. When an employee has suffered an injury covered by this Chapter which precludes the employee from earning wages |inequal to wages earned prior to the injury, the employee shall be entitled to prompt rehabilitation services.
B. (1) The goal of rehabilitation services is to return a disabled worker to work, with a minimum of retraining, as soon as possible after an injury occurs. The first appropriate option among the following must be chosen for the worker:
(a) Return to the same position.
(b) Return to a modified position.
(c) Return to a related occupation suited to the claimant’s education and marketable skills.
(d) On-the-job training.
(e) Short-term retraining program (less than twenty-six weeks).
(f) Long-term retraining program (more than twenty-six weeks but not more than one year).
(g) Self-employment.
[[Image here]]
Prior to the 1989 amendment to La. R.S. 23:1226, the objective of rehabilitation was to educate and increase the job marketability of employees who could not return to their former positions. The amended statute no longer extensively relies on voca *271 tional education and instead seeks a minimum of retraining. Wilson v. Grosjean Contractors, Inc., 28,831 (La.App.2d Cir.10/30/96), 682 So.2d 1264, unit denied, 97-0012 (La.2/7/97), 688 So.2d 510.
The sanctions of a penalty and attorney fees sought by Black are not provided in La. R.S. 23:1226.[2] Vocational rehabilitation has been declared to be a “claim due” under La. R.S. 23:1201.2. Haynes v. Williams Fence and Aluminum, 02-0442 (La.4/21/03), 851 So.2d 917. La. R.S. 23:1201.2 provided for an assessment of attorney fees, but not a penalty, when an |n employer or insurer discontinued payment of claims due and the discontinuance was arbitrary, capricious, or without probable cause. Conduct that is arbitrary or capricious is conduct consisting of:
... willful and unreasoning action, without consideration and regard for facts and circumstances presented, or of seemingly unfounded motivation. Stated another way, such behavior arises from unrestrained exercise of the will or personal preference or lacks a predictable pattern.
Brown v. Texas-LA Cartage, Inc., 98-1063 (La.12/1/98), 721 So.2d 885, 890. Citations omitted.
La. R.S. 23:1201.2 was repealed by Act 1204 of 2003. Its provisions were reproduced in a subsection (I) that was added to La. R.S. 23:1201 by Act 1204. The new subsection provides for the assessment of a penalty along with attorney fees.
The supreme court in Haynes observed in a footnote that it was only concerned with the discontinuation of rehabilitation services; it was not presented with a failure to commence vocational rehabilitation and whether penalties would be appropriate in that instance. Whether a penalty could be assessed for the failure to comply with La. R.S. 23:1226 was answered by the supreme court later that year in Chelette v. Riverwood International USA, Inc., 03-1483 (La.10/17/03), 858 So.2d 412. The Chelette court reiterated the differences between La. R.S. 23:1201 [failure to commence payment of benefits], as it appeared prior to its amendment by Act 1204 of 2003, and La. R.S. 23:1201.2 [discontinuation of benefits]. The Chelette court stated that the sanctions of penalties and attorney fees imposed by La. R.S. 23:1201 were not directed at the vocational rehabilitation obligation of La. R.S. 23:1226.[3] Accordingly, the only sanction available in this matter to Black is attorney fees under La. R.S. 23:1201.2.
Shellie McBride is a branch manager for Crawford & Company Health Care Management, and among her duties is to provide vocational rehabilitation services. She has her Master’s Degree in rehabilitation counseling and is a Social Security vocational expert and a licensed and certified rehabilitation counselor. McBride described how she generally attempts to first place a claimant in the same job with the same employer, then in a different job with the same employer, then in the same job with a different employer, then in a different job with a different employer, and finally she examines self-employment or retraining.
*272 McBride took over Black’s file in December of 2000, after the case was referred to her department in November of that year. She first met with Black on December 19, 2000, to have him answer questions on a vocational evaluation worksheet used by McBride to learn more about her clients. Black’s attorney, Hersy Jones, stopped this interview because McBride was not writing down Black’s answers verbatim. McBride recalled that Jones preferred having a court reporter present or the evaluation taped. She would have permitted Jones to record the meeting, but he told her that he could not do so without her attorney present.
McBride never met with Black again after the initial meeting. McBride sent Jones a letter dated December 27 requesting a second | ^interview. She explained that due to the early termination of the interview, she did not obtain information regarding Black’s interests, prior work history, and independent job searches. A second interview would allow her to obtain the necessary information. McBride also stated that her attorney told her that his presence at the interview was not necessary. Jones inexplicably failed to respond to this letter. McBride estimated that Black returned the completed worksheet to her on January 3, 2001.
On January 8, 2001, McBride completed a vocational evaluation report based upon the information she had received from Black. On that same date, Dr. Wall noted in response to a letter dated January 5 from McBride that he agreed with Dr. Osborne’s suggested work restrictions.
On January 15, 2001, McBride wrote to Jones that she had received the vocational evaluation worksheet and would like to meet with Black to discuss his interests in returning to work and his responses to questions on the worksheet. Again, Jones did not respond to this letter.
On January 29, 2001, McBride wrote to Jones about a janitor position that was available at Goodwill. Although Dr. Wall had not approved the job description at that time, McBride thought this position would be an excellent opportunity because Goodwill worked with disabled individuals.[4] McBride offered Black her assistance in applying for the job and in interviewing. Goodwill told her that Black would have to apply in person. Black and his mother claimed that he applied for the position and was not hired.
| uMcBride gathered job descriptions from the Dictionary of Occupational Titles, and then forwarded the descriptions to Dr. Wall for his approval. McBride agreed that Dr. Wall would approve a job description and not the actual duties at a specific job, but she explained that she would try to find an employer who matched the job description approved by Dr. Wall.
On April 17, 2001, Dr. Wall approved a job description for the position of customer service representative/counter sales person at a dry cleaner. The job duties for that position included receiving and examining articles to be cleaned, quoting prices and preparing work tickets, collecting amounts due, and returning finished articles to customers.
Dr. Wall also approved the job description for the position of housekeeper/cleaner at a hotel, with modifications for minimal handling, spraying and fingering. Dr. Wall noted that because Black had poor finger dexterity, the job would need to be adjusted for duties requiring fine dexterity; otherwise, the job was appropriate. Dr. Wall did not approve job descriptions for fast-food worker and convenience store *273 cashier-checker. McBride never asked Dr. Wall why he did not approve these.
On April 30, 2001, McBride wrote to Jones that Dr. Wall had approved the customer service representative/counter sales person and housekeeper/cleaner job descriptions. She requested that Black apply for jobs meeting the job descriptions as she identified them. Black thought he could perform the jobs unless they required “serious” gripping or grasping, |1Band he thought he could function as a housekeeper or cleaner' if it did not require long periods of spraying.
McBride sent a letter dated May 15 to Jones stating that she had found counter-helper/cashier positions at $1.50 Cleaners and at Imperial Dry Cleaners. McBride also offered to work with Black on his résumé preparation and interviewing skills. Black did not apply for the positions after receiving this letter, despite the job description having been approved by Dr. Wall, because he thought he would be unable to pick up change over a long period of time.
On June 21, 2001, McBride wrote to Jones about transportation driver and valet runner positions at a local casino. The letter stated that the driver position required that Black be able to drive vehicles with automatic or standard transmissions. McBride testified that she thought this was an appropriate position based upon Black’s ability to drive.
On June 28, 2001, Dr. Wall rejected the job description for valet runner at a casino because it required operating a vehicle with a standard transmission. The next month, Dr. Wall rejected the job description for a transportation driver position with a casino for the same reason. McBride wrote to Dr. Wall on August 28, 2001, that the transportation driver position did not require operation of a vehicle with a standard transmission. She was awaiting Dr. Wall’s response when she learned that Black had been killed.
On August 28, 2001, McBride wrote to Jones about a dry cleaner/customer service representative position available at Azalea Cleaners. She again offered vocational assistance such as résumé ^preparation or interviewing skills. Black had been murdered the previous day.
Black stated that on his own he applied for a job at á Lucent Technologies job fair. He took a test there but did not pass. He said he also applied for a light-duty job at Goodwill, but he never heard anything from them. His mother also testified that he applied for the Goodwill position. Of the job vacancies which McBride had made him aware, this was the only job for which he actually applied.
Job alternatives for Black were obviously limited by the nature of the injuries to his fingers, by his work experience, and by his lack of education. Black had graduated from high school and had one year of college. He did not know how to use a computer, although he felt he could learn how to operate one. He also thought he could work as a driver delivering light packages if it did not involve driving for a long period of time. When asked what type of job he would like to do, Black remarked that he would like to be a host, greeter, or receptionist, anything that did not require a great deal of using the hands.
Black had worked nights for Red River Sanitors for' several months prior to the accident, but he had not tried to return to work there. He thought he could return to Red River Sanitors if the position involved light-duty tasks such as cleaning mirrors for short periods of time. Black believed that he could clean a hotel room, which would include making beds, turning off televisions, dusting, sweeping, mopping, *274 and vacuuming for short periods of time. He would sweep by placing his left hand at the 117bottom and right hand at the top of the broom, and closing the thumb and index finger together on the right hand to hold the broom.
McBride was not aware if Black was offered a customer service representative position at H & S or Lofland. She never met with anyone from H & S or Lofland, and she never did an analysis of H & S to see if jobs were available for Black there. She was not aware of any light-duty work available at H & S for Black. It was her understanding when she received the file that working a light-duty job at H & S was not an option.
McBride never offered retraining services or additional education to Black. She did not conduct vocational testing for Black, and she did not explore self-employment. The only vocational rehabilitation plan she was proceeding with at the time was to find available jobs in his area.
McBride explained that retraining is generally not offered until there are no viable jobs in the community. She felt her obligation to offer retraining was never triggered. If she had been unable to offer Black a viable position, and she thought he would have been a good candidate for retraining, then she would have considered it in the future, but she felt she needed to learn more about his interests. McBride admitted that Black was questioned about his interests at the initial interview, and that Black possibly told her that he was interested in learning computer skills.
Defendants attempt to portray Black as uncooperative based upon what occurred at the interview. However, it is not clear what information McBride felt she was lacking due to early termination of the interview. Jones told McBride to leave the worksheet in order for it to be completed, |1sand then the worksheet was returned to her in early January, a few weeks after the initial interview. McBride explained that she uses the responses on the vocational evaluation worksheet to ask additional questions. Thus, although the sheet was returned to her completed, she argued that she did not have all the followup information that she wanted.
McBride wrote down additional questions at the time she received the worksheet. She wanted to know if Black could write with his left hand, and who would write for him if he could not write. However, these questions were not mentioned in her January 15 letter to Jones.
On February 14, 2001, McBride wrote a letter to defendants’ attorney requesting that he ask Black several questions during an upcoming deposition. These suggested questions included:
• What household chores Black performed;
• What Black did during a regular day;
• Whether Black had looked for any employment since being released to return to work in June of 2000; and
• Whether Black had any specific vocational goals that he wanted to accomplish.
McBride thought of some of these questions after receiving the worksheet. She felt there might even be future questions based upon the deposition responses to those questions. However, McBride never reviewed the deposition to determine if her questions had been answered, and she never used the deposition for any purpose.
We also note that over the span of approximately eight months, McBride notified Black of only three positions under job descriptions |1flapproved by Dr. Wall.[5] *275 Black stated that he had applied for one of these positions and was not hired. The remaining two available positions, both at dry cleaners, were jobs that involved some cashier work. Perhaps Black’s lack of motivation to pursue these jobs was somewhat explained by his awareness that finding employment would possibly end the Social Security disability benefits that he was receiving. Nevertheless, Black would have had some difficulty performing the tasks required of a counter-helper/cashier at the dry cleaners. McBride found these positions despite her own admission that it would be difficult for Black to pick up change. Clearly, she should have found positions better suited to Black’s needs and qualifications. In other words, the small number of approved positions discovered by McBride is strong evidence that retraining or education should have been explored in this instance as a way to expand Black’s job prospects.
A WCJ has great discretion in awarding or denying penalties and attorney fees. Nowlin v. Breck Const. Co., 30,622 (La.App.2d Cir.6/24/98), 715 So.2d 112. Under the circumstances of this record, we conclude that the WCJ abused its discretion and was clearly wrong in finding that defendants provided adequate vocational rehabilitation services. We remand this matter for a determination of appropriate attorney fees.
12 ffjQñand as Part of Judgment
Finally, Mrs. Black argues that the WCJ erred in determining that Lof-land was Black’s employer. The record does not support Mrs. Black’s position. Black listed H & S and Lofland as employers in his claim for compensation. We note that in its original answer, Lofland denied that Black was its employee at the time he was injured. However, Lofland filed an amended answer in which it admitted that Black was employed by H & S and by Lofland at the time he was injured. Appellant’s argument is without merit.

Answer

Defendants answer the appeal seeking attorney fees and costs for what they allege is a frivolous appeal. An appellate court may award damages for a frivolous appeal. La. C.C.P. art. 2164. An appeal is deemed frivolous only if it does not present a substantial legal question, or if it is obvious either that the sole purpose is delay or that appealing counsel does not seriously believe the view he has advocated. Hays v. Volentine, 29,555 (La.App.2d Cir.5/7/97), 694 So.2d 633.
This is not a frivolous appeal. We deny defendants’ demand for attorney fees and costs.
CONCLUSION
We reverse the judgment insofar as it denied Black’s claim for attorney fees regarding the obligation to provide vocational rehabilitation. We remand to the WCJ for a determination of attorney fees. In all other respects, the judgment is affirmed.
| ^DECREE
With each party to bear their own costs, the judgment is AFFIRMED IN PART and REVERSED IN PART, and REMANDED to the court below for a determination of attorney fees.

. La. R.S. 23:1201(D) states that PPD installment benefits shall become due on the thirtieth day after the employer or insurer receives a medical report giving notice of the permanent partial disability, and that all such compensation then due shall be paid.

. La. R.S. 23:1226 was amended by Act 980, § 1 of 2003 to add subparagraph (B)(3)(b), which provides that an employee has no right of action against a vocational counselor for tort damages related to the performance of vocational services until administrative remedies are exhausted.

. It is not clear, in light of Haynes, whether or not La. R.S. 23:1201(1) would apply to the vocational rehabilitation obligation in future cases, as Chelette discussed the version of La. R.S. 23:1201 prior to its amendment by Act 1204 of 2003.

. The job description was submitted to Dr. Wall on January 31, 2001.

. This is assuming that Dr. Wall approved the Goodwill janitor job description, which was not even submitted to Dr. Wall until after McBride gave Jones and Black notice of the position. McBride's case file does not show whether the description was rejected or approved.